## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RENITA G. NORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-3109 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Renita G. Norris appeals from the denial of her application for

Social Security Disability Insurance Benefits (DIB) under Title II and

Supplemental Security Income (SSI) under Title XVI of the Social Security Act

(collectively Disability Benefits). 42 U.S.C. §§ 416(i), 423, 1381a and 1382c.

This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Norris filed

Plaintiff's Motion for Summary Judgment and Memorandum of Law (d/e 10)

(Norris Motion). The Defendant Commissioner filed a Motion for Summary

Affirmance (d/e 12). This matter is before this Court for a Report and

Recommendation. For the reasons set forth below, this Court recommends that

the Decision of the Commissioner should be affirmed.

STATEMENT OF FACTS

Norris was born on June 12, 1963.  She completed high school and two years of college courses.  She previously worked as a cashier/waitress.  She has not engaged in substantial gainful activity since April 26, 2012. She has, however, worked part-time as a waitress and cashier after that date.  She suffers from depression, bipolar disorder, anxiety disorder, history of attention-deficit disorder and impulsive disorder, and transient borderline obesity.  Norris alleged in her application that she became disabled on April 26, 2012 (Alleged Onset Date or AOD).  R. 22, 24, 30, 31, 32, 71, 933.

Events Prior to the First Evidentiary Hearing

 On June 8, 2012, Norris saw Dr. Pak Fung, M.D., at the emergency department of the Carlinville, Illinois Area Hospital.  R. 669-75.  Norris went to the emergency department with complaints of an earache.  Norris had a history of anxiety, bipolar disorder, and depression.  R. 670.  The admitting nurse's psychosocial evaluation of Norris stated that Norris was cooperative, attentive, and appropriate.  R. 674.  Dr. Fung prescribed an antibiotic for the ear infection and Prozac for her depression.  R. 671.

On August 8, 2012, state agency psychologist Dr. Howard Tin, Psy.D., prepared a Mental Residual Capacity Assessment.  R. 166-69.  Dr. Tin opined that Norris was moderately limited in her ability to: understand, remember, and

carry out detailed instructions; maintain attention and concentration; perform activities within a schedule, maintain regular attendance, and be punctual; and work in coordination or in proximity to others.  R. 167.  Dr. Tin also opined that Norris was moderately limited in her ability to interact with the general public and with coworkers and set realistic goals or make plans independently.  R. 167-68.  Dr. Tin indicated that Norris could carry out short and simple instructions, and respond appropriately to changes in work settings, be aware of normal hazards, and travel in unfamiliar settings.  R. 169.

On November 27, 2012, state agency psychologist Dr. Donald Henson, Ph.D., prepared a Mental Residual Functional Capacity Assessment. R. 189-91.  Dr. Henson's opinions were the same as Dr. Tin's August 8, 2012 opinions.  R. 189-91.

On October 7, 2013, Norris saw advanced practice nurse Denise Johnson-Pritchett, APN, for symptoms of bipolar disorder.  R. 717-21.  Norris reported anxious/fearful thoughts, depressed mood, difficulty sleeping, and excessive worry.  Norris reported that Prozac worked "ok." Norris said that she also had taken Focalin but could not afford the cost of the medication.  R. 718.

Norris reported to Johnson-Pritchett that she had a history of drug abuse and alcoholism.  Norris stated that she had not consumed alcohol in two years.

Norris also reported that she smoked cigarettes daily, and she smoked marijuana once or twice a week for "sleep/mood."  R. 718, 720.

On examination, Norris was oriented, had normal insight and judgment, and appropriate mood and affect.  Norris was slightly tearful when discussing depression, but otherwise her behavior was within normal limits.  R. 720.  Norris resumed taking Prozac after this visit.  R. 717.

On November 5, 2013, Norris saw Johnson-Pritchett for a follow-up examination.  R. 722-27.  Norris reported that she attempted suicide in the past, but had no current plans, thoughts, or means to hurt herself or others.  She indicated feeling tearful.  She noted that her uncle recently died.  R. 725. On examination, Norris exhibited compulsive behavior, normal insight and judgment, poor attention span and concentration, and appropriate mood and affect.  R. 726. Johnson-Pritchett counseled Norris.  R. 726-27.

<u>The First Evidentiary Hearing</u>

On November 8, 2013, the Administrative Law Judge (ALJ) conducted an evidentiary hearing in this matter.  R. 41-61.  Norris appeared in person pro se. R. 43.  The ALJ told Norris she had "an absolute right to have an attorney or non-attorney person" represent her at the hearing.  R. 47.  The ALJ explained what a representative could do for Norris.  The ALJ told Norris that a representative

could represent her on a contingency fee basis.  R. 47-52.  Norris decided she

wanted to be represented.  The ALJ continued the hearing.  R. 53.

Events Between the First and Second Evidentiary Hearing

On December 5, 2013, Norris saw Johnson-Pritchett again.  R. 890-93.

Norris reported "anxious/fearful thoughts, depressed mood, difficulty

concentrating, difficulty sleeping, diminished interest or pleasure, fatigue, feelings

of guilt, increased energy, loss of appetite, racing thoughts, restlessness, and

thoughts of death or suicide."  Norris, however, stated that she "Feels about 25%

better."  She said she had no current thoughts of hurting herself and had no

plans or means to do so.  R. 891.  On examination, Norris had a slightly

depressed affect, but an otherwise normal psychiatric evaluation.  R. 893.

Johnson-Pritchett stopped the Prozac prescription and prescribed Seroquel.  R.

890.

May 13, 2014, Norris went to Wellspring Resources for counseling.  She

saw licensed clinical professional counselor Lindsey Perdun, LCPC.  R. 927-28.

Norris walked in for treatment, but could not finish the assessment that day.  R.

927.  On May 15, 2014, Norris saw Perdun again.  R. 925-26.  Upon evaluation,

Perdun assessed serious functional impairment and recommended high intensity

community based services.  R. 925-26.

On May 21, 2014, Perdun completed a full assessment of Norris.  R. 905-24.  Perdun assessed major depressive disorder without psychotic features, generalized anxiety disorder, and alcohol dependence in sustained full remission.  Perdun assigned a Global Assessment of Functioning (GAF) score of 45.  R. 923.  Perdun recommended counseling and medication services.  R. 922.

On June 18, 2014, Norris saw Perdun to formulate an Individual Recovery Plan.  R. 897-04.  Perdun reiterated her May 21 diagnosis and GAF score of 45.  R. 902-03.  Perdun recommended individual and group counselling sessions.  Norris agreed to keep scheduled appointments.  R. 903-04.

<u>The Second Evidentiary Hearing</u>

On June 26, 2014, the ALJ conducted another evidentiary hearing.  R. 61-103.  Norris appeared in person and with her attorney.  Vocational expert Delores Gonzalez appeared by telephone.  R. 61-63

 Norris testified first.  Norris said that she started taking her medications a month before the hearing.  She also indicated that she stopped smoking marijuana.  R. 69.  The ALJ stated that he would order a consultative psychological examination.  R. 70.

Norris said she completed high school and two years of college.  She received a certificate in culinary arts in 2010.  R. 71-72.  Norris stopped working in April 2012.  She said she did not know if she quit or was laid off.  R. 72.  Norris

said that she last consumed alcohol four years before the hearing.  She testified she last used cocaine in 1994.  R. 73.

Norris indicated that she could not work because she could not talk to anyone without "being an emotional wreck."   R. 74.  She said doctors prescribed Prozac and Seroquel.  The medications did not help and her anxiety was getting worse.  R. 77.  Her prescription for Prozac ended in December, but she still had pills in date and took them until they ran out a month before the hearing.  R. 86. Norris said she still had some Seroquel pills, but did not take them because "it makes my legs tingle and stuff."  R. 87.   She indicated the therapy "helped a little bit."  She could not take some medications because they could be addictive. Norris testified that she was undergoing therapy.  R. 77.

Norris said she did not want to get out of bed 29 out of 30 days a month. She said she just stayed in her pajamas 25 out of 30 days a month.  She did not go out and did not have any friends.  R. 79-80.

Norris believed if she were on her medication, she would show up for a job, but could not work.  She said she would leave before the end of the workday. She said,

> They tell me when I am at work that he'll call me and I am not fast
> enough or I am not retaining it or I know I can do it but I am just not
> doing it and then I think they are wrong and then I get frustrated and
> then I try to make excuses and it was all there but it -- maybe it just --
> gladly I think. It has got to be just me. It can 't be everybody else. It's
> got to me.

R. 83-84.

At the end of the hearing, the ALJ gave Norris 30 days to supplement the record. The ALJ also sent Norris for a psychological consultative examination. R. 100-02.

Events Between the Second and Third Evidentiary Hearing

Posted earnings reports showed that or about July 1, 2014, Norris started working part-time as a waitress. R. 30. According to Norris, she started working sometime in June 2014. R. 125-26.

On July 17, 2014, state agency psychologist Dr. Stephen Vincent, Ph.D., performed a mental status assessment of Norris and prepared a Medical Source Statement of Abilities to do Work-Related Activities (Mental). R. 930-35. Norris reported that she last worked more than a year before the examination as a waitress. She said she could not maintain employment because of agitation, disturbances, and multiple conflicts with co-workers and supervisors. R. 933. She admitted past alcohol abuse, but denied any current alcohol or drug problems. She reported completing an alcohol treatment program in November 2013. She said she had been sober since 2013. R. 935. On examination, Dr. Vincent assessed bipolar II disorder, recurrent; and alcohol abuse and dependence in full and sustained remission. R. 935.

Dr. Vincent opined that Norris had moderate limitations in her ability to understand, remember, and carry out simple instructions; marked limitations in her ability to understand, remember and carry out complex instructions, carry out instructions; and marked limitations in her ability to make judgments on work-related decisions on both simple and complex work-related decisions.  R. 930. Dr. Vincent found that Norris had moderate limitations in her ability to interact appropriately with the public and co-workers; and marked limitations in her ability to interact appropriately with supervisors and to respond appropriately to usual work situations and to changes in routine.  R. 931.

On July 24, 2014, Norris went to Wellspring Resources.  Norris saw Advanced Practice Nurse Jean Strazar, APN, for a psychiatric evaluation. R. 950-55.  Strazar assessed a major depressive disorder, recurrent without psychotic features; generalized anxiety disorder; and alcohol dependence. Strazar assigned a GAF score of 49.  Norris reported to Strazar that she had an appointment that day with her primary care physician, Dr. Johnson.  Strazar prescribed Paroxetine (Paxil) and continued therapy.  R. 954.

On August 26, 2014, the ALJ issued an unfavorable decision finding that Norris was not disabled.  R. 208-25.  Norris appealed the decision to the Social Security Administration Appeals Council (Appeals Council).

On September 5, 2014, Norris saw Strazar.  Norris reported that the Paxil was helpful for her depression and anxiety.  R. 942.  Strazar assigned a GAF score of 54.  R. 944.  Strazar increased the dosage on the Paxil and recommended anger management group counseling.  R. 945.

On October 13, 2014, Norris missed appointments with Strazar and her counselor.  On December 23, 2014, Wellspring Resources sent Norris a 12-day pre-close letter.  R. 939.

On February 23, 2015, Norris returned to Wellspring Resources.  Norris returned for services on advice of her attorney representing her in her application for Disability Benefits.  R. 938.  Norris saw Licensed Clinical Social Worker Diana Jarman.  Jarman diagnosed major depressive disorder, recurrent, severe without psychotic features; generalized anxiety disorder; and alcohol dependence in sustained full remission.  Jarman assigned a GAF score of 45.  R. 940. Wellspring Resources discharged Norris from care because she dropped out of services.  R. 938.

On February 28, 2015, Norris went to the Carlinville Emergency Department complaining of left eye droop and right arm numbness.  R. 963-68. Norris saw Dr. Simone Borges-Young, M.D.  On examination, Dr. Borges-Young noted that Norris was negative for anxiety, depression, and agitation.  R. 964.

Dr. Borges-Young assessed possible Bell's palsy. Norris was discharged to home. She was in stable and good condition. R. 967.

On April 16, 2015, Norris went to the Carlinville Emergency Department because of a burn. R. 960-62. Norris saw Dr. Mohammed Siddiqui, M.D. Norris had second-degree burns on her left hand, breast and abdomen. R. 962. She was burned by hot water. R. 960. Norris reported that she still smoked but denied use of illicit drugs or alcohol. Norris reported that she was not taking any medications. Norris was alert and oriented. R. 961. Dr. Siddiqui treated the burn, prescribed antibiotics and pain medicine, and discharged her. Dr. Siddiqui provided Norris with a note stating that she was off work until April 18, 2015. R. 962.

The next day, April 17, 2015, Norris saw Physician's Assistant Wayne Blevins, Jr., PA-C at the Carlinville Family Practice offices for a follow-up examination of her burns. R. 994-96. On examination, Norris was alert and cooperative. Blevins continued the medications provided by the emergency department and instructed Norris to return in three days. R. 995. Norris returned on April 20, 2015, and April 24, 2015. R. 992-93, 990-91. Norris' burns were healing well on April 20. R. 993. On April 24, Norris had lost a blister on her abdomen. Blevins instructed her to return as needed. R. 991.

On August 26, 2015, the Appeals Council vacated the ALJ's August 26, 2014 decision and remanded for further proceedings.  R. 228-30.

On October 27, 2015, Norris went to the Carlinville Emergency Department, with loss of consciousness and positional vertigo.  R. 975-82.  She saw Dr. Pak Fung, M.D.  Norris reported that she was not taking any medications.  R. 976-77.  On examination, Norris was alert, oriented, and her memory was intact.  Norris was negative for anxiety, depression, and agitation.  R. 979.  Norris was admitted for observation.  R. 982.

On October 30, 2015, Norris saw Nurse Practitioner Hollie Trettenero, FNP-C. R. 987-89 for a follow-up after a visit to the Carlinville Emergency Department.  Norris reported that she went to the Emergency Department after she broke into a sweat, became lightheaded, and fainted at home.  She indicated hearing things, but being unable to respond.  She said she had blurred vision.  She reported pressure on her chest.  Norris said she was not taking any medication for bipolar disorder or depression at the time.  Norris told Trettenero that her chest pain and dyspnea had not changed.  She also reported symptoms of anxiety, lightheadedness, nausea, and sweating.  R. 987.

On examination, Norris was alert and oriented, and she had no impairment to her recent or remote memory.  She had normal visual acuity, sensation, and

reflexes.  R. 988.  Trettenero assessed chest pain, prescribed aspirin, and referred Norris to a cardiologist.  R. 989.

### The Third Evidentiary Hearing

On December 1, 2015, the ALJ conducted an evidentiary hearing after the remand by the Appeals Council.  R. 104-61.  Norris appeared in person and with her attorney.  Vocational expert Dr. Darrell Taylor, Ph.D., also appeared, and psychological expert psychologist Dr. Michael Cremerius, Ph.D., appeared by telephone.  R. 106.

Dr. Cremerius testified first.  Dr. Cremerius summarized the evidence in the record.  R. 115-18.  Based on his review of the record, Dr. Cremerius opined that Norris had a mood disorder and an anxiety disorder that were "relatively moderate, except that the more recent CE [consultative examination by Dr. Vincent] describes her as more substantial."  R. 119.  Dr. Cremerius opined that Norris had the following functional limitations due to her mental condition:

> I think that she could understand and remember simple and detailed instruction. I guess I would preclude complex instruction. I would limit her to performing more simple, routine tasks. I would limit her interactions with the public to only incidental, which means that she could be in proximity to the public but have no direct responsibility for serving the public. She could have occasional contact with coworkers and supervisors. I would further preclude any fast paced tasks with strict production quotas.  End of the day production quotas would be fine and I think that these restrictions could extend back to the AOD of 4/26/2012.

R. 119.

Dr. Cremerius opined that Norris could not work as a waitress because she would have contact with the public and because the job could be "fast paced with really strict production quotas."  R. 120.

Norris then testified.  The ALJ asked Norris about the statement in Dr. Vincent's report that she last worked a year before the examination.  Norris said she told Dr. Vincent she was working as a waitress and hoped to keep the job. R. 124-25.

Norris testified that she started working at a restaurant in June 2014. Norris testified that she still worked at the restaurant as of the time of this hearing.  She said,

> It's a coffee house. I serve coffee to farmers and there's -- they have -- they serve good food, but I mean, it's a small kind of -- do I work well with the others?  No, I -- still things haven't changed. I just threatened a girl two weeks ago. I didn't mean to do it. She kind of got in there.
> . . . .
> I serve coffee to farmers if they order eggs and then I feed it to them. But I work a morning shift most times, because I don't do change very well.  My boss knows that.  Closing now, I can't really close because I --

R. 127.  Norris testified that she worked four days a week.  R. 133.  Norris said she tried working more hours, but she could not.  R. 147.

Norris said her employer has given her warnings making disparaging to customers about the cook and her boss.  She had problems with coworkers.  She

indicated one coworker called her a "bipolar bitch."  R. 144.  Norris said she grabbed a glass filled with liquid and threw the liquid on the co-worker.  R. 145.[1]

The ALJ asked her about her posted earnings records that showed she made $2,842 in the second quarter of 2014 and $3,484 in the fourth quarter of 2014.  Norris testified that her employer overstated the amount of money she made in tips.  Norris said she did not make that much money at her job.  R. 128-30.  Norris also testified that she worked at other restaurants in 2014.  R. 134-35.

Norris confirmed that she had a certificate in culinary arts.  She also testified that she had a driver's license and drove.  R. 132. She said she took care of chickens and traded the eggs for cigarettes and feed for the chickens.  R. 137.  Norris said she smoked four or five cigarettes a day, and she smoked marijuana two or three times a week.  R. 136, 139.

Norris said she stopped taking her medication.  R. 136.  Norris indicated she could not afford Seroquel.  She said the doctor would not give her Xanax because it could be addictive.  She agreed with the ALJ, however, that she could afford Prozac and Paxil.  She also said the medicines had too many side effects, such as weight gain.  R. 141-42, 147-49.

---

[1] The transcript says that Norris testified that she threw "a glass of key" on the co-worker.  R. 145.  The word "key" seems to be an error.

Norris said she did not seek treatment because she cannot manage any

additional activities besides working,

> I -- all I could do, to manage to do what I do, to get up to go work and
> do there, do what I do. I don't go -- I just come straight home. I used
> to be able to take myself to the store even though I didn't like it. I
> have to – I don't take -- I don't do that anymore either. I go to work
> and I come home and that is it.

R. 145-46.

Norris said she did not go out alone.  She went grocery shopping with her

daughter.  She did not go out by herself.  R. 146-47.

Vocational expert Dr. Taylor then testified.  The ALJ asked Dr. Taylor to

consider a hypothetical person with Norris' age, education, work experience, and

the following limitations:

> Q So, doctor, please assume I find this person capable of performing
> the exertional demands of a wide range of work that is there are no
> exertional limitations, but there are additional limitations and they are
> as follows. There is to be no climbing of ladders, ropes, or scaffolds,
> no concentrated exposure to pulmonary irritants, such as smoke,
> dust, odors, fumes, gases, and poor ventilation. I limit the individual to
> simple tasks that are routine and repetitious. I further limit the
> individual to no interaction with the general public and to occasional
> interaction with coworkers and supervisors. And additionally, I limit
> the individual to no fast paced production quotas. However, an end of
> day quota is permitted.

R. 156.  Dr. Taylor opined that such a person could not do Norris' past work.  Dr.

Taylor also opined that Norris could perform other jobs in the national economy.

Dr. Taylor listed representative jobs of housekeeper with 14,000 such jobs in

Illinois at the light exertional level and 384,000 nationally; and hand packer with

19,000 such jobs in Illinois, and 326,000 nationally.  R. 157.

Dr. Taylor said a person who engaged in oral altercations with her co-

workers could not work if the altercations became violent.  Dr. Taylor opined that

a person could not work if she could not sustain an eight-hour workday, or if the

person consistently missed work one day a month.  R. 158. The ALJ then

concluded the hearing.  R. 159-61.

## THE DECISION OF THE ALJ

On February 16, 2016, the ALJ issued his decision.  The ALJ followed the

five-step analysis set forth in Social Security Administration Regulations

(Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant

not be currently engaged in substantial gainful activity.  20 C.F.R. §§

404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe

impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a

determination of whether the claimant is so severely impaired that she is disabled

regardless of her age, education and work experience.  20 C.F.R. §§

404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's

condition must meet or be equal to the criteria of one of the impairments

specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§

404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Norris met her burden at Step 1.  The Court found that Norris had not engaged in substantial gainful activity since April 2012  The ALJ noted that Norris posted earnings in the last quarter of 2014 that qualified as substantial gainful activity, but she testified that the posted records were not

accurate.  The ALJ decided out of "judicial efficiency" not to delay the case by investigating the claim that her employer falsified earnings records.  R. 24.

The ALJ found at Step 2 that Norris had severe impairments of depression, bipolar disorder, anxiety disorder; history of attention-deficit disorder and impulsive disorder; and transient borderline obesity.  Her body mass index ranged between 29 and 31.  R. 24.  The ALJ found at Step 3 that Norris' impairments or combination of impairments did not meet or equal any Listing.  R. 25-26.  In doing so, the ALJ found that Norris was moderately limited in her ability to maintain concentration, persistence or pace.  R. 25.

At Step 4, the ALJ found that Norris had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she cannot climb ladders, ropes, or scaffolds. She cannot have concentrated exposure to pulmonary irritants such as smoke, dust, odors, fumes, gases, and poor ventilation.  She can perform simple, routine, repetitive tasks. She cannot interact with the public. She can occasionally interact with coworkers and supervisors. She cannot perform fast-paced production quotas; however, an end of day quota is permitted.

R. 26. The ALJ relied heavily on Dr. Cremerius' testimony in reaching this finding.  R. 27.  The ALJ also relied on the fact that Norris worked part time and lived alone.  He additionally relied on the opinions of Drs. Tin and Hanson and the medical records of examinations in which she did not display any symptoms of

anxiety or other symptoms.  R. 30.  Finally, the ALJ relied on evidence that Norris' medications were effective when she took them.  R. 27-29.

The ALJ discounted Dr. Vincent's opinions.  The ALJ stated that Dr. Vincent's opinions were inconsistent with the other evidence in the record.   The ALJ found that Dr. Vincent based his opinion in part on inaccurate information that Norris gave him.  The ALJ found Norris misinformed Dr. Vincent that she had not worked in a year, when she was working at the time of the examination; and that she had been sober since 2013 when she told other medical professionals in 2014 that she had been sober for three or four years.  The ALJ further stated that Norris did not tell him about her marijuana use when Dr. Vincent inquired about illegal drug use.  The ALJ concluded that Dr. Vincent did not have accurate and complete information when he formulated his opinion.  R. 30.

At Step 4, the ALJ found that Norris could not perform her past relevant work given her RFC.  R. 32.

At Step 5, the ALJ found that Norris could perform a significant number of jobs that exist in the national economy.   The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Dr. Taylor that she could perform the representative jobs of cleaner, house cleaner, and hand packer.  R. 32-33.  The ALJ concluded that Norris was not disabled.  R. 33.

Norris appealed.  On February 14, 2017, the Appeals Council denied

Norris' request for review.  The February 16, 2016 decision of the ALJ became

the final decision of the Defendant Commissioner.  R. 1; see e.g., Roddy v.

Astrue, 705 F.3d 631,636 (7th Cir. 2013).  Norris then brought this action for

judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine whether

it is supported by substantial evidence.  Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate" to support the

decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must

accept the findings if they are supported by substantial evidence, and may not

substitute its judgment or reweigh the evidence.  Jens v. Barnhart, 347 F.3d 209,

212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This

Court will not review the ALJ's evaluation of statements regarding the intensity,

persistence, and limiting effect of symptoms unless the evaluation is patently

wrong and lacks any explanation or support in the record.  See Pepper v. Colvin,

712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir.

2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security

Administration no longer uses the term credibility in the evaluation of statements

regarding symptoms).  The ALJ must articulate at least minimally his analysis of

all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

Norris raises only one issue on appeal.  Norris argues that the ALJ erred in finding that Norris' RFC was limited to simple, routine, repetitive tasks, with no interaction with the public, only occasional interaction with coworkers and supervisors, without fast-paced production quotas, but with end of day quotas. Norris argues that this limitation was vague and not related to the ALJ's findings that Norris was moderately impaired in concentration, persistence, or pace.  See Norris Motion, at 8-15.

Norris relies on the Seventh Circuit Court of Appeals' decisions that have reversed Commission decisions in which the ALJ found limitations in an RFC, such as the simple routine task limitations set forth above, when no evidence in the record showed that those limitations adequately accounted for the claimant's mental limitations.  See e.g., O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010); Yurt v. Colvin, 758 F.3d 850, 857 (7th Cir. 2014).

Unlike the cases cited by Norris, the ALJ's use of these limitations in Norris' RFC, was supported by evidence in the record.  Dr. Cremerius opined that the limitations included in the ALJ's RFC accurately described limitations of Norris due to her mental impairments.  R. 119.  The ALJ's decision, therefore, was

supported by the evidence in the record and was not vague.  The ALJ adopted the limitations which Dr. Cremerius opined.  See Varga v. Colvin, 794 F.3d 809, 814 (7th Cir. 2015) (The ALJ's hypothetical question to a vocational expert should include the findings made by the consulting psychological experts regarding functional limitations).

Norris also complains that the RFC limitation that she "cannot perform fast-paced production quotas; however an end of the day quota is permitted" is vague.  Norris relies on the Varga decision for this point.  In Varga, the ALJ included a limitation of that the claimant had to be "free of fast paced production requirements."  The Varga court found this term vague and not tied to the limitations found by the expert testimony in the record.  Varga, 794 F.3d at 815.  The Varga opinion does not state that using limitations involving the inability to perform quota-based work is vague.

Furthermore, the Varga opinion states that the ALJ should include the findings of medical consultants in the formulation of the claimant's functional limitations.  Id. at 814.  Here, Dr. Cremerius opined that Norris' functional limitations due to her mental impairments included these precise limitations, "I would further preclude any fast paced tasks with strict production quotas.  End of the day production quotas would be fine . . . ."  R. 119.  The ALJ followed the Varga opinion and adopted the limitations opined by Dr. Cremerius.  The ALJ

built a logical bridge from Dr. Cremerius' testimony to his conclusions.  Clifford, 227 F.3d at 872.  The decision was supported by substantial evidence.  There was no error.

Norris raises no other issues on appeal.  All other issues, therefore, are waived.  See e.g., Schomas v. Colvin, 732 F.3d 702, 707 (7th Cir. 2013).

THEREFORE, THIS COURT RECOMMENDS that the Defendant Commissioner's Motion for Summary Affirmance (d/e 12) should be ALLOWED, Plaintiff Renita Norris' Motion for Summary Judgment and Memorandum of Law (d/e 10) should be DENIED, and the decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   July 30, 2018

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE